**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAYAL AZIZ AHMED AL-MITHALI, : | |
|     Detainee, Guantánamo Bay Naval Station | |
|     Guantánamo Bay, Cuba, : | |
| | |
| ALI AZIZ AHMED AL-MITHALI, : | |
|     as Next Friend of Hayal Aziz Ahmed | |
|     Al-Mithali, : | |
|                   *Petitioners*, : | **Civil Action No. 05-CV-02186** |
| | **(ESH)** |
| v. : | |
| | |
| GEORGE W. BUSH, *et al*., : | |
|                    *Respondents.* : | |

### MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING TRANSFER OF PETITIONER OR ALTERNATIVELY, REQUIRING THIRTY DAYS' NOTICE OF INTENT TO TRANSFER PETITIONER

Petitioners Hayal Aziz Ahmed Al-Mithali, by and through his Next Friend, Petitioner Ali Aziz Ahmed Al-Mithali, respectfully submits this motion to the Court requesting issuance and entry of an Order:

a)       Pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having knowledge of this Order by personal service or otherwise, from removing Petitioner al-Mithali from the Guantánamo Bay Naval Base ("Guantánamo"), other than to transfer him to another facility, or otherwise to release him from detention, within

22075262v1

the United States, pending the Court's determination of Petitioner al-Mithali's Petition for

Issuance of A Writ of Habeas Corpus; or

b)      In the alternative, pursuant to Rule 65 of the Federal Rules of Civil Procedure,

requiring Respondents, their agents, servants, employees, confederates, and any other persons

acting in concert or participation with them, or having knowledge of this Order by personal service

or otherwise, to provide Petitioner's counsel at least thirty days' advance notice of any specific

intention to remove Petitioner al-Mithali from Guantánamo, other than to transfer him to another

facility, or otherwise to release him from detention, within the United States, pending the Court's

determination of Petitioner al-Mithali's motion for a preliminary injunction.

22075262v1

Dated: Washington, D.C.
        November 18, 2005

          Respectfully submitted,

          Counsel for Petitioner

          /s/ John B. Missing_____
          John B. Missing (Bar No. 425469)
          Jennifer C. Argabright (Bar. No. 480763)
          DEBEVOISE & PLIMPTON LLP
          555 13th Street, N.W. Ste 1100E
          Washington, D.C. 20004-1169
          Tel:  (202) 383 8000
          Fax:  (202) 383 8118

          Jeffrey I. Lang
          Jennifer R. Cowan
          Philip Rohlik
          Ellen A. Hochberg
          Tatia L. Miller
          DEBEVOISE & PLIMPTON LLP
          919 Third Avenue
          New York, NY 10022
          Tel:  (212) 909-6000
          Fax:  (212) 909-6836

          *Of Counsel*
          Barbara Olshansky
          Gitanjali Gutierrez
          CENTER FOR CONSTITUTIONAL RIGHTS
          666 Broadway, 7th Floor
          New York, New York 10012
          Tel: (212) 614-6439
          Fax: (212) 614-6499

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---------------------------------------------------------------------- x

HAYAL AZIZ AHMED AL-MITHALI,      :
    Detainee, Guantánamo Bay Naval Station
    Guantánamo Bay, Cuba,      :

ALI AZIZ AHMED AL-MITHALI,      :
    as Next Friend of Hayal Aziz Ahmed
    Al-Mithali,      :

                Civil Action No. 05-CV-02186
           *Petitioners*,      :  (ESH)

v.      :

GEORGE W. BUSH, *et al.*,      :

           *Respondents.*      :

---------------------------------------------------------------------- x

### PETITIONER'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING TRANSFER OF PETITIONER OR ALTERNATIVELY, REQUIRING THIRTY DAYS' NOTICE OF INTENT TO TRANSFER PETITIONER

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28

U.S.C. § 1651, Petitioner Hayal Aziz Ahmed Al-Mithali ("Petitioner Al-Mithali"), by and

through his next friend Ali Aziz Ahmed Al-Mithali ("Next Friend Al-Mithali"), respectfully

submits these Points and Authorities in support of Petitioner's application for the immediate

issuance of a temporary restraining order and preliminary injunction enjoining Respondents

("Respondents" or "Government") from removing Petitioner Al-Mithali from the Guantánamo

Bay Naval Base ("Guantánamo") other than to transfer him to another facility within the United

States or to release him from custody within the United States.  In the alternative, Petitioner

seeks entry of an order requiring Respondents to provide the Court and counsel for Petitioner Al-Mithali with at least thirty days' notice of any intended removal of Petitioner Al-Mithali from Guantánamo other than to transfer him to another facility within the United States or to release him from custody within the United States.

The relief sought by Petitioner Al-Mithali is both reasonable and warranted. He is a Yemeni national caught in an international maelstrom. For nearly four years, he has languished in a Guantánamo prison – half-way around the world from his home and with extraordinarily limited access to family, friends or anyone else in the world. Petitioner Al-Mithali seeks to be released from foreign captivity, but at the same time – because he has been branded an "enemy combatant" by Respondents – the circumstances of his release could expose him to significant risks to his safety. The designation as an "enemy combatant," yet to be reviewed by an independent tribunal, renders Petitioner Al-Mithali a potential target for abuse, persecution, and violence in many parts of the world.

The threat to Petitioner Al-Mithali's safety is not confined to lawless mobs or vigilantes, but perhaps he is at greatest risk from foreign governments that even Respondents acknowledge engage in torture and other affronts to basic human rights. Indeed, the Government has acknowledged that several Yemeni prisoners have been transferred to the custody of Yemeni authorities, which have a documented record of human rights abuses, including the use of torture as an interrogation tool. Moreover, there have been news reports that in some cases, Respondents have transferred detainees to the custody of foreign government precisely because those governments countenance torture as an interrogation tool.

2

Respondents have refused to stipulate that, during the pendency of this proceeding, they will not transfer Petitioner Al-Mithali to the custody of foreign governments from which Petitioner faces substantial risk of violence.  To the contrary, Respondents have acknowledged transferring other Guantánamo detainees to the custody of foreign governments that are known to practice torture, and that they intend to transfer more detainees to those foreign governments.

Based on the very real risk, indeed likelihood that, as a result of Respondents' unreviewed declaration that Petitioner is an "enemy combatant," Petitioner may be dispatched to a prison somewhere else in the world -- before this Court has had the opportunity to hear Petitioner's pleas that he never should have been detained by Respondents in the first place, and that Respondents' plan to transfer him will subject him to unconscionable threat of torture, violence or other abuse -- Petitioner asks only that Respondents be restrained from doing so until the Court has heard his petition.  At a minimum, Petitioner asks that Respondents be required to provide advance notice of any specific plan to transfer him.

The relief sought by Petitioner Al-Mithali would neither unfairly prejudice the Government nor unduly impair the Government's ability to discharge its responsibilities.  To the contrary, the relief sought would simply maintain the status quo – or merely require the Government to provide thirty days' notice prior to seeking to alter the status quo – to enable the Court to address the merits of Petitioner Al-Mithali's pending petition for habeas corpus without being deprived of jurisdiction by a transfer.  The relief that Petitioner Al-Mithali seeks is identical to that previously ordered by this Court and others in this district on essentially identical allegations.  *See Al Daini v. Bush,* 05-CV-634, slip op. (D.D.C. June 6, 2005); *Al-Joudi*

*v. Bush,* 05-CV-00301, slip op. (D.D.C. Apr. 4, 2005); *Al-Oshan v. Bush,* 05-CV-0520, slip op. (D.D.C. Mar. 31, 2005).

On November 8, 2005, Petitioner's counsel contacted Respondents' counsel and requested that Respondents stipulate that Respondents would not remove Petitioner from Guantánamo, other than to release him in the United States, or in the alternative, first provide Petitioner's counsel at least thirty days' advance notice of a planned move. On November 10, Respondent's counsel flatly refused the request.

## STATEMENT OF FACTS

Petitioner Al-Mithali is a Yemeni citizen who is being detained as an "enemy combatant" at Guantánamo. As detailed in the Petition for Issuance of A Writ Of Habeas Corpus (the "Petition"), upon information and belief, Petitioner Al-Mithali denies being an "enemy combatant" and contends that he is being detained in violation of the Constitution, treaties, and laws of the United States. Counsel for Petitioner Al-Mithali only recently received security clearance necessary to visit Guantánamo and therefore have not had an opportunity to meet with Petitioner Al-Mithali.

Upon information and belief, Petitioner Al-Mithali has been detained at Guantánamo since January 2002. According to news reports, the United States has secretly moved detainees and others suspected of terrorist crimes from Guantánamo to foreign countries for interrogation and/or detention without complying with extradition procedures or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is used to facilitate interrogation by subjecting detainees to torture.

4

Petitioner Al-Mithali has reason to fear that, without any illusion of due process, he may be transferred into the custody of a foreign government and face inhumane conditions of detention.  News reports indicate that the United States Government has been planning "to cut by more than half the population at its detention facility in Guantánamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials."  Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba,* N.Y. Times, Mar. 11, 2005, at A1.  The Government recently reached an agreement to transfer 110 detainees to Afghanistan for further detention, and negotiations on similar arrangements are progressing with Saudi Arabia.  *See* Neil A. Lewis, *Guantánamo Detention Site Is Being Transformed, U.S. Says,* N.Y. Times, Aug. 6, 2005, at A8. In requiring notice prior to any transfer of detainees, another court in this district noted that Respondents have not denied press reports detailing Respondents' plans, "to accelerate the transfer of Guantánamo detainees to other sovereigns and other locations."  *Abdullah v. Bush,* 05-CV-0023, slip op. at 4 (D.D.C. Apr. 8, 2005).

Respondents not only have transferred detainees to the custody of other foreign countries – and thus dispatching the detainee to some other end of the world while at the same time potentially divesting the Court of jurisdiction to hear the habeas petition – but have transferred detainees to the custody of foreign countries known to practice torture and other human rights abuses.  Official government documents confirm transfers of detainees from Guantánamo to countries that are known to practice torture.  *See, e.g.,* FBI memos dated February 23 and 29, 2004, March 11, 2004, and April 4 and 7, 2004, *available at* http://www.aclu.org/torturefoia/released/FBI_3928_3940.pdf (detailing transfers of detainees

5

from Guantánamo to countries including Afghanistan, Russia, Pakistan, Turkey, and Iraq).  The Government has admitted in court filings that the United States transfers detainees "to the control of other governments for investigation and possible prosecution and continued detention…Such governments can include the government of a detainee's home country, or a country other than a detainee's home country that may have law enforcement or prosecution interest in the detainee." *See* Decl. Matthew C. Waxman ¶3, *in Al-Adahi v. Bush,* 05-CV-280, (D.D.C. March 8, 2005) (attached as Ex.1).  The Government has admitted that, as of March 8, 2005, sixty-five detainees had been transferred from Guantánamo Bay to the control of their home governments for further detention.  *See id.* at ¶ 4.

Based on the public reports of an international human rights organization, the Government has transferred custody of at least two other Yemeni citizens detained at Guantánamo into the hands of Yemeni authorities, who have then imprisoned them indefinitely without charge or access to counsel or judicial process. *See, e.g.*, Amnesty International, USA/JORDAN/YEMEN Torture and Secret Detention: Testimony of the 'Disappeared' in the 'War on Terror' (2005) ("On or around 5 May 2005, two Yemeni detainees were released from (Guantánamo) and transferred back to Yemen. . . . Authorities in Yemen told Amnesty International that they have no reason for holding the two men except that their transfer from US detention was conditional upon them being held in Yemen."), *available at* http://web.amnesty.org/library/index/engamr511082005.  *See also*, Josh White, *Prisoner Accounts Suggest Detention At Secret Facilities*, Washington Post, Nov. 7, 2005, at A11.

Moreover, the Government acknowledges that Yemeni security forces commonly subject detainees to torture and other cruel, inhuman, and degrading treatment and punishment.  *See* U.S.

6

Dept. of State, Country Reports on Human Rights Practices:  Yemen, Feb. 28, 2005 *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41736.htm.  (According to the Government, "there were reports [that the Yemeni state security and intelligence apparatus] increased its use of … abuse such as sleep deprivation, cold water, and threats of sexual assaults.  There were reports that the [Criminal Investigative department] routinely used torture in order to obtain confessions.") *Id.*

Indeed, the Government's own policy countenances the transfer of a detainee to the custody of a foreign government even when the Government is aware of a specific risk that the detainee will be tortured.  According to the Government's official policy, a detainee may be transferred to a country known to practice torture so long as the Government believes that the chance of the detainee being tortured is less than fifty percent.  *See* Ex. 1, Decl. Matthew C. Waxman at ¶6..  Thus, pursuant to official policy, the Government knowingly transfers detainees to foreign governments that practice torture, and – even if they have a specific basis for believing that the detainee in fact is actually at risk of torture – the Government may transfer the detainee so long as the risk does not rise to more than fifty percent.

Thus, Petitioner Al- Mudafari faces the threat of a lifetime of persecution by virtue of Respondents' decision to brand him an "enemy combatant" based on evidence never disclosed or reviewed by an independent tribunal.  Moreover, Petitioner Al-Mithali now faces the prospect that Respondents will deprive him of his opportunity for relief through his habeas proceeding by delivering him into the custody of a foreign government that may immediately or subject him to torture or other abuse.  Other courts in this district have taken the Government's policy and practices into consideration when granting requests for preliminary injunctions under nearly

7

identical circumstances.  *See, e.g., Abdullah v. Bush,* 05-CV-0023, slip op. at 4; *Kurnaz v. Bush*, 04-CV-1135, slip op. at 4 (D.D.C. Apr. 12, 2005).

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973).  Further, this Court may issue a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure to preserve the status quo between the parties pending a final determination of the merits of the action.  *See* 13 Moore's Federal Practice 3d, § 65.20 (2004) (stating that as preliminary injunctions are intended "to preserve the status quo between the parties pending a final determination of the merits of the action and that ("a request for a preliminary injunction that seeks to store the status quo will ordinarily be granted.").

Each of the four factors to be weighed in awarding a temporary restraining order or preliminary injunction favors granting the requested relief: (1) Petitioner will suffer irreparable harm if the relief is denied; (2) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries where they may be subject to detention and torture; (3) Petitioner's Petition has raised serious, substantial issues; and (4) no harm will be suffered by Respondents if the temporary restraining order or injunction is granted. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001). *See also, Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921 (D.C. Cir. 1958).  These four factors "interrelate on a sliding scale," so that "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *Serono Labs., Inc. v. Shalala,* 158

F.3d 1313, 1318 (D.C. Cir. 1998).  *See also Hicks v. Bush*, No. 02-299(CKK), 2005 U.S. Dist

Lexis 27646 (D.D.C. Nov. 14, 2005).

      1.     Petitioner Al-Mithali Will Be Irreparably Harmed If
                He Is Transferred To The Custody Of A Foreign Government

Courts in this district have recognized "two obvious and substantial threats" in similar

factual situations: 1) the deprivation of Petitioner's right to have his habeas claims considered by

a unbiased tribunal, and 2) the potential harm from a transfer to a country where Petitioner may

be tortured.  *See, e.g., Al-Joudi v. Bush,* 05-CV-00301, slip op. at 8-9.

First, by transferring Petitioner Al-Mithali to another country, the Government would

unilaterally deprive the court of jurisdiction to consider and resolve Petitioner Al-Mithali's

claims of unlawful detention.  In the absence of the limited relief requested here, Petitioner Al-

Mithali's claims, which invoke the fundamental concept of due process – including the elemental

right to have a grievance heard by a tribunal – will be unilaterally defeated by the Government,

the very party against whom due process violations have been alleged.  *See Rumsfeld v. Padilla,*

124 S. Ct. 2711, 2722 (2004) ("District courts are limited to granting habeas relief within their

respective jurisdictions.") (internal quotations omitted).  Courts in this district have found that

such purposeful denial of due process, in and of itself, constitutes irreparable harm and warrants

issuing an injunction requiring notice prior to transfer.  *See Abdah v. Bush,* No. 04-CV-1254, slip

op. at 7 (D.D.C. Mar. 29, 2005) (holding that transfer out of the Court's jurisdiction in itself

"clearly satisfies the preliminary injunction standard" of irreparable harm).

22075262v1

Second, Petitioner Al-Mithali may suffer immeasurable and irreparable harm – ranging from his torture to his possible death – if transferred to the custody of a foreign government. This Court has required notice prior to transfer upon a showing of torture by the transferee government.  *See Mamet v. Bush*, No. 05-CV-1602, slip op. at 2 (D.D.C. Sept. 30, 2005).

In a habeas proceeding brought by a Guantánamo detainee, another court in this district has issued a temporary restraining order and preliminary injunction regarding possible transfer based on claims of immediate, irreparable harm due to the possibility of torture after transfer because "the possibility of transfer to a country where [a detainee] might be tortured or indefinitely confined, … undeniably would constitute irreparable harm" and such a "threatened injury is not merely remote and speculative; it is a serious potential threat."  *See, e.g., Al-Joudi v. Bush,* 05-CV-00301, slip op. at 8-9 (granting a temporary order and preliminary injunction restraining the Government from transferring petitioners without thirty days' notice).

Indeed, according to some accounts, Respondents have transferred detainees not simply in callous disregard of the risks of injury, but specifically to exploit the willingness of foreign governments to torture or otherwise mistreat persons in their custody.  *See* Chanrasekaran & Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, 2002, at Al. [1]  In that regard, the risk is not whether Petitioner Al-Mithali will be mistreated by foreign

---

[1]     Respondents have denied that they transfer detainees to the custody of foreign governments specifically to exploit the willingness of these other governments to use torture as an interrogation technique.  However, the existence of credible reports of torture and the absence of any accountability are precisely the reason that the public's interest weighs so heavily in favor of an injunction that would preserve the Court's jurisdiction.

governments, but rather the risk is whether Respondents will select Petitioner Al-Mithali for such transfer.

2.    Public Policy Favors A Preliminary Injunction.

Petitioner Al-Mithali has a right to judicial review of the basis of his detention.  *See Rasul v. Bush,* 124 S. Ct. 2686, 2698 (2004).  The vindication of the right to petition for judicial review is important not only to Petitioner Al-Mithali, but indeed to the American public at large, which itself has a compelling interest in seeing that the right of an indigent Yemeni national is not only observed in form, but meaningful in fact.  A court in this district has found that "the public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated in an appropriate manner."  *Al-Joudi v. Bush,* 05-CV-00301, slip op. at 14-15.

The American framework of governance rests on a fundamental balance of powers, both between the government and the people, as well as among the branches of government.  This balance of power includes at its core the right of any federal prisoner – properly before the Court – to challenge meaningfully the basis on which he is being detained by the executive branch. This right, to be meaningful, must exist independent of the executive branch's own interests; the right to petition the judiciary cannot turn on the executive branch's acquiescence.  To allow the executive branch to avoid altogether its obligation to respond to a petition for habeas relief, by transferring a prisoner to the custody of a foreign government that is likely to continue to hold the prisoner captive, and that may even exacerbate the conditions of confinement, would not simply jeopardize the right of a Yemeni indigent to invoke the power of the Great Writ, but would permit a dangerous drift in the balance of powers.  That the executive branch has

11

transferred prisoners specifically to foreign countries, in some instances neither the prisoner's home country nor the country where he was apprehended, but where the ruling power can be expected to continue to exercise custody over the prisoner under conditions considered inhumane here, and perhaps even affirmatively exploited these other government's allowance of physical abuse, is all the more reason to restrain such action until the petition has been resolved.

The public's interest in holding the executive branch to its obligation to answer the petition is especially compelling in this case, because the executive branch's actions have been conducted entirely behind closed doors.  Respondents took custody of Petitioner Al-Mithali nearly four years ago, and since then have transferred him thousands of miles away from his home to a United States military facility, where he has been held virtually incommunicado. During this entire time Respondents have refused to disclose the circumstances of his apprehension and the grounds for his apprehension and continued imprisonment; Respondents have refused to permit communication and access to Petitioner – indeed, Respondents refused even to voluntarily disclose that Petitioner Al-Mithali was in custody.  The public has a substantial stake in maintaining the keystone in our relationship to government, namely that a prisoner, even an indigent alien, can call upon the executive branch to answer for its actions, taken in the name of the United States, to deprive a person of his liberty, as well as to defend its intention to deliver him to the custody of foreign governments.

Respondents' concerns about national security have been protected, even at the expense of the public's traditionally paramount right of holding government accountable for its actions through public proceedings.  But the public's interest in this and related proceedings have not been abated altogether, only held in abeyance in the interests of national security.  This motion,

12

however, which asks only that Respondents defend their professed unilateral right to transfer a prisoner to the custody of a foreign government even at the expense of the prisoner's physical safety, does not represent a risk to national security. In the absence of a preliminary injunction that preserves the Court's jurisdiction, as well as the physical safety of the Petitioner, the public's right to governmental accountability on a matter of global geopolitical importance will be subject to the discretion of the very persons whose actions are at issue.

> 3.  Petitioner Al-Mithali Has Raised Serious, Substantial Issues Justifying Injunctive Relief

To justify his request for a temporary restraining order and a preliminary injunction, Petitioner Al-Mithali need not show "a mathematical probability of success," but rather only that the questions raised by his habeas claims are so, "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977), *quoted in Al-Joudi v. Bush,* 05-CV-00301, slip op. at 11. Petitioner Al-Mithali's habeas claims clearly rise to this level of seriousness.

Petitioner Al-Mithali has properly invoked the jurisdiction of this Court in seeking habeas review of the legality of his detention at Guantánamo. *See Rasul*, 124 S. Ct. at 2698. Likewise, despite finding that "the mathematical probability of success is impossible to assess" with regard to habeas claims of those detained at Guantánamo, a court in this district has found that "there can be no doubt that the questions raised here are so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation." *Al-Joudi v. Bush,* 05-CV-00301, slip op. at 11-12

13

(internal citations omitted).  The substantial questions raised in this proceeding merit a preliminary injunction that would preserve the opportunity of the Court to resolve them.

The Supreme Court's determination in *Rasul* that the Court has the jurisdiction to determine the legality of the ongoing detention of petitioners held in Guantánamo perforce means that the Court has the authority to preserve its jurisdiction against actions by Respondents, regardless of intent, that would have the effect of circumventing the Court's jurisdiction.  *See* All Writs Act, 28 U.S.C. § 1651(a); *Kurnaz v. Bush*, 04-CV-1135, slip op. at 4 (D.D.C. Apr. 12, 2005); *Al-Marri v. Bush,* 04-CV-2035, slip op at 10, fn. 11 (D.D.C. April 4, 2005), *quoting Securities and Exchange Comm'n*, 74 F.3d 287, 291 (D.C. Cir. 1996) (All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction").  Under the All Writs Act, the Court, "may and should take such action as will defeat attempts to wrongfully deprive parties" of their rights to vindicate claims."  *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004).  *See also Lindstron v. Graber*, 203 F.3d 470, 474-76 (7th Cir. 2000) (All Writs Act permits courts to stay extradition pending appeal of habeas corpus petition); *Michael v. Immigration and Naturalization Service*, 48 F.3d 657, 664 (2d Cir. 1995) (All Writs Act permits federal appellate court to stay deportation order pending review of its legality).

Similarly, in another proceeding brought by a Guantánamo detainee, a court in this district has held that under Rule 23(a) of the Federal Rules of Appellate Procedure, Respondents may not transfer a detainee pending review of the petition for habeas corpus relief.  *Abdah v. Bush,* 04-CV-1254, slip op. at 8 (D.D.C. Mar. 29, 2005).  The Court in *Abdah* held that the Rule, "was designed to prevent prison officials from impeding a prisoner's attempt to obtain habeas corpus relief by physically removing the prisoner from the territorial jurisdiction of the court in

14

which a habeas petition is pending." *Id.* (citations omitted).  The Court specifically rejected

Respondents' contention there that Rule 23(a) should not be applied in the context of a detainee

facing transfer to the custody of foreign governments.  The Court held that:

> Rule 23(a) acquires an even greater importance in the context of
> Petitioners' case. When a prisoner with a pending habeas action is simply
> transferred from one state to another in violation of Rule 23(a), the
> transfer "does not divest [the court of its] jurisdiction over the action."
> *Reimnitz v. State's Attorney of Cook County*, 761 F.2d 405, 409 (7th
> Cir.1985). Here, though, Petitioners' transfer to another nation would
> assuredly deprive the court of its jurisdiction. Petitioners thus demonstrate
> that they have a clear likelihood of success in blocking a transfer made
> absent notice to, and approval from, the court.

*Id.*

Beyond the ultimate relief sought by Petitioner Al-Mithali, that is, his release from

detention, Petitioner Al-Mithali is likely to prevail, following a hearing on the merits, on an

application for a permanent injunction restraining Respondents from exercising unilateral and

unfettered power to transfer him to any country -- and to the custody of any government -- they

choose.  Besides the clear risk that a transfer might deprive the Court altogether of jurisdiction,

courts have recognized that a transfer may raise substantial questions relating to the potential for

Respondents to attempt to divest the jurisdiction of the Court while continuing to exercise

control over the fact and conditions of detention; for example, a transfer by Respondents to the

custody of a different United States custodian in a foreign country, such as a United States

military base in Afghanistan or in Iraq; or a transfer to a foreign sovereign acting under the

direction of or subject to an agreement with Respondents or the Government; or a transfer to the

custody of a foreign government of a country in which the detainee had never had occasion to

violate its laws, thus raising questions as to the involvement of Respondents in continuing conditions of detention. *See, e.g Kurnaz v. Bush*, 04-CV-1135, slip op. at 4-5.

Moreover, the right to petition the Court for relief from unlawful conditions of detention, and for release from detention altogether, must also encompass the terms and conditions of transfer to the custody of a foreign government, especially in the context of Guantánamo detainees. The "release" of Petitioner from detention by Respondents, which may take the form of a transfer to a prison run by a foreign government, may pose a grave risk of physical danger to Petitioner. Respondents in some instances have transferred detainees to the custody of cooperative foreign governments that, even the Government has acknowledged, condone the practice of torture and other affronts to the basic human rights of prisoners in their custody. It is not difficult to imagine possible transfers that would pose a risk of injury even greater than continued detention at Guantanamo – all of which has been occasioned by Respondents' secretive proceedings that resulted in the public declaration that a detainee is an "enemy combatant" and imprisonment at Guantánamo. The Court's authority to review and ameliorate conditions of detention that violate minimal standards of decency must similarly comprehend the authority to ameliorate conditions of release from unlawful detention that pose a significant threat to safety.

4.     The Requested Relief Will Not Burden Respondents

In contrast to the harm that Petitioner Al-Mithali stands to suffer from rendition to another country, Respondents, who have already held Petitioner Al-Mithali for nearly four years, are asked only to refrain from transferring him while his petition for habeas relief is before the

Court or, in the alternative, to provide counsel and the Court with adequate notice of any intended removal of Petitioner Al-Mithali from Guantánamo. The practical effect of the relief requested is to afford Petitioner Al-Mithali the opportunity, if necessary, of challenging a decision by Respondents to transfer him to a country where his safety would be at risk. Respondents will suffer no conceivable prejudice from a preliminary injunction that does nothing more than preserve that opportunity of Petitioner Al-Mithali to challenge such an action, as well as Respondents' opportunity to seek to defeat his challenge.

## CONCLUSION

For the reasons discussed above, Petitioner Al-Mithali, by and through Next Friend Al-Mithali, respectfully requests that this Court grant his motion for a temporary restraining order and preliminary injunction prohibiting Respondents from removing Petitioner Al-Mithali from Guantánamo other than releasing him from detention within the United States, or in the alternative, requiring Respondents to provide the Court and counsel for Petitioner Al-Mithali with at least thirty days' notice of any intended removal of Petitioner from Guantánamo other than releasing him from detention within the United States.

Dated: Washington, D.C.
      November 18, 2005

                           Respectfully submitted,

                           Counsel for Petitioner

                           _____/s/_____
                           John B. Missing (Bar No. 425469)
                           Jennifer C. Argabright (Bar. No. 480763)
                           DEBEVOISE & PLIMPTON LLP
                           555 13th Street, N.W. Ste 1100E

Washington, D.C. 20004-1169
Tel:  (202) 383 8000
Fax:  (202) 383 8118

Jeffrey I. Lang
Jennifer R. Cowan
Philip Rohlik
Ellen A. Hochberg
Tatia L. Miller
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel:  (212) 909-6000
Fax:  (212) 909-6836

*Of Counsel*
Barbara Olshansky
Gitanjali Gutierrez
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

18

# **TABLE OF UNREPORTED CASES**

utilized in
## **PETITIONER HAYAL AZIZ AHMED AL-MITHALI'S**
Points and Authorities
In Support of TRO And Preliminary Injunction

*Al Daini v. Bush,* 05-CV-634, slip op. (D.D.C. June 6, 2005).

*Al-Joudi v. Bush,* 05-CV-00301, slip op. (D.D.C. Apr. 4, 2005).

*Al-Oshan v. Bush,* 05-CV-0520, slip op. (D.D.C. Mar. 31, 2005).

*Abdullah v. Bush,* 05-CV-0023, slip op. (D.D.C. Apr. 8, 2005).

*Kurnaz v. Bush*, 04-CV-1135, slip op. (D.D.C. Apr. 12, 2005).

*Abdah v. Bush,* No. 04-CV-1254, slip op. (D.D.C. Mar. 29, 2005).

*Mamet v. Bush*, No. 05-CV-1602, slip op. (D.D.C. Sept. 30, 2005).

*Kurnaz v. Bush*, No. 04-CV-1135, slip op. (D.D.C. April 12, 2005).

*Al-Marri v. Bush,* No. 04-CV-2035, slip op. (D.D.C. April 4, 2005).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
OMER SAEED SALEM AL DAINI           )
et al.,                             )
                                    )
        Petitioners,                )
                                    )
            v.                      )    Civil Action No. 05-634 (RWR)
                                    )
GEORGE W. BUSH et al.,              )
                                    )
        Respondents.                )
_____)


### MEMORANDUM ORDER

Petitioner Omer Saeed Salem Al Daini, through his next
friend, Mohammed Saeed Salem Al Daini, seeks a writ of habeas
corpus, challenging the legality of his detention by the United
States at Guantanamo Bay Naval Base, Cuba.  Respondents moved for
a stay of proceedings [Dkt. # 3] pending resolution of the
appeals in In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443
(D.D.C. 2005), appeal docketed, No. 05-8003 (D.C. Cir. March 10,
2005), and Kalid v. Bush et al., 355 F. Supp. 2d 311 (D.D.C.
2005), appeal docketed sub nom. Boumediene v. Bush et al., No.
05-5062 (D.C. Cir. March 10, 2005).  Petitioners' opposition to
the stay [Dkt. # 4] requests, among other things, that petitioner
not be removed or transferred from Guantanamo Bay without 30
days' prior notice to this court and counsel for petitioners, and

-2-

that a factual return setting forth the basis for petitioner's detention be filed within 30 days.

A primary purpose of a stay pending resolution of the issues on appeal is to preserve the status quo among the parties. Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (a stay pending appeal is preventative or protective, and seeks to maintain the status quo pending a final determination of issues on appeal); see Warm Springs Dam Task Force v. Gribble, 417 U.S. 1301, 1310 (1974) (granting stay pending appeal to maintain the status quo between the parties). A court may, in appropriate situations, specify protective conditions in balancing the hardship necessarily imposed on the party whose suit or execution of judgment has been stayed pending appeal. Cooks v. Fowler, 459 F.2d 1269, 1272-73 & n.27 (D.C. Cir. 1971) (affirming condition of stay requiring tenant appealing judgment to deposit funds in court registry pending appeal); see also, City of Portland, Or. v. Federal Maritime Comm'n, 433 F.2d 502, 504 (D.C. Cir. 1970) (directing the proponent of a stay in a case challenging shippers' exclusion of one city's port from service to "be prepared to state reasons why this court should not impose a conditional stay requiring the rotation of service among the ports involved pending final review and determination"); Scott v. Scott, 382 F.2d 461, 462 (D.C. Cir.

-3-

1967) (discussing a stay of execution of judgment conditioned

upon support payments); Center for Int'l Environmental Law v.

Office of the U.S. Trade Rep., 240 F. Supp. 2d 21, 23 (D.D.C.

2003) (conditioning stay pending appeal on party seeking an

expedited appeal).  Where, as here, the condition imposed on the

proponent of the stay is "neither heavy nor unexpected," imposing

a protective condition is well within a court's discretion.

Cooks v. Fowler, 459 F.2d at 249 (quoting Bell v. Tsintolas

Realty Co., 430 F.2d at 482 (D.C. Cir. 1970) (stating "[w]e have

little doubt that . . . [a court] may fashion an equitable remedy

to avoid placing one party at a severe disadvantage during the

period of litigation")).

    Therefore, here

    the court will "guard against depriving the processes
    of justice of their suppleness of adaptation to varying
    conditions." Landis v. North American Co., 299 U.S.
    248, 256 (1936).  Coextensive with a district court's
    inherent power to stay proceedings is the power to
    craft a stay that balances the hardships to the
    parties.  Id. at 255 (noting concern regarding a stay
    causing "even a fair possibility . . . [of] damage to
    some one else."); see also Clinton v. Jones, 520 U.S.
    681, 707 (1997) (noting that "burdens [to the parties]
    are appropriate matters for the District Court to
    evaluate in its management of the case.").

Al-Oshan v. Bush, Civil Action No. 05-520 (D.D.C. Mar. 31, 2005)

(Urbina, J.) (Order, Dkt. # 12).  Accordingly, it is hereby

-4-

ORDERED that respondents' motion for a stay [Dkt. # 3] be, and hereby is, GRANTED in part and DENIED in part. The proceedings in this case are STAYED pending resolution of the appeals pending before the United States Court of Appeals for the District of Columbia Circuit in In re Guantanamo Detainee Cases and Boumediene v. Bush et al., except that petitioners may seek emergency relief from this court in appropriate circumstances, such as when petitioners have reason to believe that they are facing the possibility of continued detention at the request of the United States in a location that does not provide access to this court. It is further

ORDERED that respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, shall provide this court and counsel for petitioners with thirty days' written advance notice of any transfer or removal of the detained petitioner from United States custody at Guantanamo Bay. It is further

ORDERED that, given the ongoing conduct of combatant status review tribunals, respondents shall file within 30 days of the entry of this Order a factual return relating to the detained petitioner.

-5-

SIGNED this 6th day of June, 2005.


                              _____/s/_____
                              RICHARD W. ROBERTS
                              United States District Judge

Slip Copy                                                                                    Page 1
Slip Copy, 2005 WL 774847 (D.D.C.)
**(Cite as: Slip Copy)**

C

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.

Majid Abdulla AL-JOUDI, et al., Petitioners,

v.

George W. BUSH, et al., Respondents.

**No. Civ.A. 05-301(GK).**

April 4, 2005.

Julia L. Tarver, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, for Petitioners.

Terry Marcus Henry, U.S. Department of Justice Civil Division, Washington, DC, for Respondents.

MEMORANDUM OPINION

KESSLER, J.

**\*1** Petitioners, four Saudi Arabian nationals, bring this action against Defendants, seeking release from the Guantanamo Bay Naval Station ("GTMO") in Cuba, where they are being detained. FN1 This matter is before the Court on Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance Notice of Any Intended Removal from Guantanamo. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Petitioners' Motion is granted.

> FN1. Petitioners are Majid Abdulla Al-Joudi, Yousif Mohammad Mubarak Al-Shehry, Abdul-Hakim Abdul-Raman Al-Moosa, and Abdulla Mohammaed Al-Ghanmi. There are four other Petitioners, who are Next Friends of the detainees. The Next Friends obviously are not subject to transfer from Guantanamo. All references herein will be to the Petitioners who actually are being detained.

I. BACKGROUND

A. Procedural History

Petitioners are being detained at GTMO and have been classified as enemy combatants. FN2 On February 9, 2005, they filed a Petition for Writ of Habeas Corpus in this Court. They are among many GTMO detainees who have filed such petitions in the United States District Court for the District of Columbia since the Supreme Court held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." *Rasul v. Bush,* --- U.S. ----, ----, 124 S.Ct. 2686, 2699, 159 L.Ed.2d 548 (2004).

> FN2. Petitioners' counsel has not yet been able to meet with her clients and therefore has very limited knowledge of Petitioners' precise circumstances. Upon receiving the proper security clearances, which counsel hopes to obtain in the near future, she will travel to Cuba to meet with her client. Transcript of Motions Hearing ("Tr.") at 15 (March 30, 2005).

On January 19, 2005, Judge Richard Leon granted the Government's Motion to Dismiss the detainees' Petition for Writ of Habeas Corpus in *Khalid v. Bush,* 355 F.Supp.2d 311 (D.D.C.2005). On January 31, 2005, Judge Green granted in part and denied in part the Government's Motion to Dismiss in eleven cases consolidated pursuant to the September 15, 2004, Resolution of the Executive Session. *In re Guantanamo Cases,* 355 F.Supp.2d 443 (D.D.C.2005). FN3 The cases before Judges Leon and Green have been fully briefed in the United States Court of Appeals for the District of Columbia and are under submission.

> FN3. Judge Green's Memorandum Opinion and Order did not apply to the instant case, which was filed after the release of her Opinion.

On February 3, 2005, Judge Green granted a stay in the eleven cases to which her January 31, 2005, Opinion and Order applied. A Motion to Stay the instant case until resolution of *Khalid* and *In Re Guantanamo Cases* is pending in this Court.

B. Transfers from GTMO

Approximately 540 foreign nationals currently are being

Westlaw.

held at GTMO. Decl. of Matthew C. Waxman ¶ 2 ("Waxman Declaration"). FN4 The Department of Defense ("DOD") states it is conducting a review of each detainee's case, at least annually, to determine whether continued detention is warranted. *Id.* at ¶ 3. Since the Government began detaining individuals at GTMO, the DOD has transferred 211 detainees to other countries. *Id.* at ¶ 4.

> FN4. Waxman is the Deputy Assistant Secretary of Defense for Detainee Affairs. *Id.* at ¶ 1.

Detainees are subject to two types of transfer: (1) transfer to the custody of another country, with the understanding that they will be released, Tr. at 22-23; and (2) transfer to the custody of another country with the understanding that the country's government has "an independent law enforcement interest" in them and that they likely will face continued detention and processing by that country's judicial system. *Id.* at 24. In each case, the United States loses all control of the detainees once they are transferred to another country. Waxman Decl. at ¶ 5.

**\*2** Of the 211 detainees who have been transferred, 146 have been transferred with the understanding that they would be released. *Id.* at ¶ 7. The Government represents that most of those individuals actually have been released, Tr. at 29, but it cannot provide precise numbers. *Id.*

Sixty-five detainees have been transferred to the control of other countries for detention. Waxman Decl. at ¶ 7. Of that group, 29 were transferred to Pakistan; 9 to the United Kingdom; 7 to Russia; 5 to Morocco; 6 to France; 4 to Saudi Arabia; and 1 each to Australia, Denmark, Kuwait, Spain, and Sweden. *Id.*

When transfers for detention are being considered, DOD coordinates with various other Government agencies, including the Department of State ("DOS"). *Id.* ¶ 6. The Government states that, as a matter of policy, it does not "repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." *Id.*

The Government claims that it ensures compliance with this policy by obtaining "assurances" from officials within the

foreign government. The process for obtaining such assurances "involves a frank dialogue, discussion, [and] communication with officials of the other government." Tr. at 32. The Government evaluates the adequacy of the assurances by considering "the identity, position, or other information concerning the official relaying the assurances," Decl. of Pierre-Richard Prosper at ¶ 8 ("Prosper Declaration"); FN5 political or legal developments in the country that would provide context for the assurances, *id.;* and U.S. relations with the country. *Id.* Senior Government officials ultimately make the final decision on whether to transfer a detainee. Waxman Decl. at ¶ 7. The Government's papers do not indicate which DOD official has this responsibility.

> FN5. Prosper is the Ambassador-at-Large for War Crimes Issues and has supervised the operation of the DOS Office of War Crimes Issues. *Id.* at ¶ 1.

In recent months, a number of newspaper articles about the transfer and treatment of detainees have been published. Some, for example, quote former employees of the United States government who have been involved in transferring detainees to other countries, including countries that practice torture. *See, e.g., * Dana Priest, *Jet Is an Open Secret in Terror War,* Wash. Post, Dec. 27, 2004, at A1. In addition, some quote by name former Guantanamo detainees who allege that they have been moved by the United States government to countries where they have been tortured. *See, e.g.* Douglas Jehl and David Johnson, *Rule Change Lets C.I.A. Freely Send Suspects Abroad,* N.Y. Times, Mar. 6, 2005, at A1.

On March 11, 2005, an article in The New York Times reported that DOD plans to transfer "hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan, and Yemen." Douglas Jehl, *Pentagon Seeks to Shift Inmates from Cuba Base,* N.Y. Times, Mar. 11, 2005, at A1.

In response to this article, several petitioners, including the Petitioners in the instant case, filed motions for temporary restraining orders and preliminary injunctions. On March 12, 2005, Judge Rosemary Collyer granted a request for a temporary restraining order in *Abdah v. Bush,* No. 04-CV-1254 (D.D.C. March 12, 2005) (order granting

temporary restraining order) and denied a similar request in *John Does 1-570 v. Bush,* No. 05-CV-313 (March 12, 2005) (order denying request for temporary restraining order). On March 29, 2005, Judge Henry H. Kennedy granted a Preliminary Injunction in *Abdah.*

**\*3** After the Motion was filed in the instant case, the Government represented to this Court that none of the parties were scheduled for transfer within the next several weeks. In addition, counsel for all parties agreed to a combined hearing on the request for a temporary restraining order and the request for a preliminary injunction. On March 17, 2005, based on those representations, the Court scheduled the hearing on the Motion for March 30, 2005.

## II. STANDARD OF REVIEW

In considering Petitioners' request for a preliminary injunction, the Court must consider four factors: (1) whether Petitioners would suffer irreparable injury if an injunction were not granted; (2) whether Petitioners have a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. *Al-Fayed v. CIA,* 254 F.3d 300, 303 (D.C.Cir.2001). FN6 "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1318 (D.C.Cir.1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995).

> FN6. The same factors apply when considering a request for a temporary restraining order. *Al-Fayed,* 254 F.3d at 303, n. 2. However, since the Court has granted the Motion for Preliminary Injunction, it is not necessary to apply these factors to their Motion for Temporary Restraining Order.

When the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." ' *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C.Cir.1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Id.* at 844.

## III. ANALYSIS

### A. Harm to Petitioners

Petitioners argue that they will suffer irreparable harm if transferred to the custody of another country that practices torture or other inhumane treatment of prisoners. Respondents argue that there is no potential harm to Petitioners, because there is no credible evidence that detainees are being transferred to countries that practice torture; instead, any transfers will be largely for purposes of release. FN7

> FN7. The Government also argues that transferring Petitioners from United States custody provides them with the very relief they seek. Tr. at 40. That argument is overly simplistic, however. Petitioners ultimately seek total freedom from all custody, not just United States custody. They can only obtain such relief in this litigation if the Court determines that their underlying detention was unconstitutional or illegal. Furthermore, a determination by a United States court that Petitioners are not enemy combatants might carry significant weight in their home country, thereby facilitating release from custody if they were transferred for continued detention. Finally, on the most human level, proud people have a strong interest in clearing their names from association with acts of violence and terrorism.

Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." *CityFed Fin. Corp.,* 58 F.3d at 747 (quoting *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). To obtain

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4
Slip Copy, 2005 WL 774847 (D.D.C.)
**(Cite as: Slip Copy)**

preliminary injunctive relief, Petitioners must show that the threatened injury is not merely "remote and speculative." *Milk Indus. Found. v. Glickman,* 949 F.Supp. 882, 897 (D.D.C.1996).

**\*4** In this case, there are two obvious and substantial threats to Petitioners. First, they face the possibility of transfer to a country where they might be tortured or indefinitely confined, which undeniably would constitute irreparable harm. While the Government presents declarations that attempt to mitigate these concerns, they neither refute Petitioners' claims nor render them frivolous. FN8 Indeed, the Government admits that 65 of the 211 detainees transferred to date have been transferred for detention, not release. Several of the 65 have been transferred to countries that our own State Department has acknowledged torture prisoners, including Pakistan, Saudi Arabia, and Morocco. *See Country Reports on Human Rights Practices-2004,* available at http://www.state.gov/g/drl/rls/hrrpt/2004. Finally, the Government was unable to provide any details about the type or form of "assurances" given, the scope of the monitoring that takes place after transfer, or the consequences of noncompliance. FN9 Tr. at 32-33. In short, the threatened injury is not merely remote and speculative; it is a serious potential threat.

> FN8. The Court notes that the Government's affidavits do not address the Central Intelligence Agency's involvement in any transfer or "rendition" programs.

> FN9. Notably, the Government was also unaware of several other important facts, such as the availability of extradition treaties with Qatar or Saudi Arabia, or the consequences if a detainee's home country refuses to accept him.

Second, Petitioners face the threat of irreparable harm based on the potential elimination of their habeas claims. It is unclear at this point whether transferring Petitioners would strip this Court of jurisdiction. *See Abdah v. Bush,* No. 04-CV-1254, Slip op. at 7 (D.D.C. March 29, 2005) (transfer to another country "would effectively extinguish [Petitioners'] habeas claims by fiat"); *but see Abu Ali v. Ashcroft,* 350 F.Supp.2d 28, 54 (D.D.C.2004) (holding that

an individual detained in Saudi Arabia could survive a motion to dismiss his habeas claim based on the theory of constructive custody). However, given the danger that, upon transfer, the Court could lose jurisdiction to adjudicate Petitioners' claims, it follows that such a transfer could obviate Petitioners' right to "test the legitimacy of [their] executive detention." *Lee v. Reno,* 15 F.Supp.2d 26, 32 (D.D.C.1998). Since such a turn of events would certainly constitute a threat of irreparable harm, an order preserving the status quo in this case is appropriate. FN10

> FN10. The Court has the authority to issue such an injunction pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vison Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996); *see also Abdah v. Bush,* No. 04-CV-1254, slip op. at 7 (March 12, 2004); *Abu Ali,* 350 F.Supp.2d at 54 (quoting *Alabama Great S.R. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906)) ("It is well-established that 'the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.' ").

Both threats are imminent. While the Court certainly has relied upon the Government's representations that Petitioners will not be transferred in the next several weeks, the Government is clearly maintaining its right to transfer them at any time after the Court rules upon the instant Motion. Thus, the threats are not distant or speculative, and transfer could occur in the near future.

              B. Likelihood of Success on the Merits

Petitioners contend that, given Judge Green's Opinion in *In re Guantanamo Cases,* they have a substantial likelihood of success on the merits of their habeas claim. The Government responds that Petitioners' claim would be barred because the treaties under which they seek review are non-self-executing, and because the review sought would encroach upon the foreign policy authority of the executive.

**\*5** To justify granting a preliminary injunction, Petitioners

Slip Copy                                                                                                      Page 5
Slip Copy, 2005 WL 774847 (D.D.C.)
**(Cite as: Slip Copy)**

need not show "a mathematical probability of success." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844. Rather, "it will ordinarily be enough" that the questions raised are so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id.* (quoting *Hamilton Watch Co.,* 206 F.2d at 740).

The exact chances of success in this case are extremely difficult to assess. It is clear, however, that, at a minimum, Petitioners have raised "fair ground [s] for litigation." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844. The issues raised in these motions are sensitive and involve complex constitutional questions. Indeed, there are areas of disagreement even among the judges on this Bench about the legal issues raised in these Petitions. Like the issues in *Hamdi v. Rumsfeld, Padilla v. Rumsfeld,* and *Rasul,* there is a strong probability that they ultimately will be resolved by the Supreme Court.

For example, there is disagreement about whether the detainees have any constitutional rights at all. *See Khalid,* 355 F.Supp.2d 311 (holding that Guantanamo detainees have no constitutional rights); *but see In re Guantanamo Cases,* 355 F.Supp.2d 311 (holding that Guantanamo detainees have some constitutional rights). There is also disagreement over whether the Court will lose jurisdiction over the cases if Petitioners are transferred to another country. *See Abdah v. Bush,* No. 04-CV-1254, slip op. at 7 (D.D.C. March 29, 2005); *but see Abu Ali v. Ashcroft,* 350 F.Supp.2d at 54. And, there is disagreement about whether the Geneva Conventions are self-executing. *See Hamdan v. Rumsfeld,* 344 F.Supp.2d 152, 164 (D.D.C.2004).

> **FN11.** The Government also argues that the Supreme Court in *Rasul* failed to protect its jurisdiction over detainees that were transferred. *Rasul, --- U.S. at ---- n. 1,* 124 S.Ct. at 2690 n. 1 (noting that two petitioners had been "released from custody" to the United Kingdom). However, the issue of transfer was not before the Court, and the *Rasul* petitioners were released to the United Kingdom, not a country known to torture its prisoners. *See Country Reports on Human Rights Practices: United Kingdom,* available at http://

wwws.state.gov/g/drl/rls/hrrpt/2004/41716.htm. ("[t]he [British] Government generally respected the human rights of its citizens").

In short, even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so "serious, difficult, and doubtful," as to make them a "fair ground for litigation." *Washington Metro. Area Transit Comm'n,* 559 F.2d at 844.

                                    C. Harm to Government

Petitioners argue that there is absolutely no harm to the Government if it is required to provide the Court and Petitioners' counsel with 30 days' notice before transferring them to another country. The Government contends, however, that there is great potential harm to its ability to conduct negotiations with foreign governments regarding the transfer and subsequent release of GTMO detainees, because such negotiations are often conducted in secret and divulging their details could seriously impair their success.

The Court fails to see any injury whatsoever that the Government would suffer from granting the requested preliminary injunction. Petitioners request only 30 days' notice of transfer-a narrow and discrete request that would impose no burden on the Government. Beyond "vague premonitions" that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority. *Abdah,* slip op. at 10 (D.D.C. March 29, 2005). For example, granting Petitioners' request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the Executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice. FN12

> **FN12.** Such issues *could* arise if Petitioners ultimately are scheduled for transfer and actually request additional relief. However, speculation about future requests is no justification for denying the narrow relief requested at this point.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                          Page 6
Slip Copy, 2005 WL 774847 (D.D.C.)
**(Cite as: Slip Copy)**

**\*6** In weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioners. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioners' claims before this Court.

### D. Public Interest

Petitioners argue that the public has a strong interest in protecting the constitutional rights of detainees. The Government responds that the requested relief would be contrary to the public interest, because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism.

The Government's argument is unpersuasive, however, for it "simply conflate[s] the public interest with [the Government's] own position," *Abdah,* 04-CV-1254, slip op. at 11 (March 29, 2005), and asks the Court to accept its predictions of harm without challenge. This the Court is not prepared to do. It is obvious beyond words that there is a strong public interest in the zealous pursuit of those who wish to commit acts of terrorism against the United States and its citizens. However, the narrow relief sought in this case will not compromise that effort in any way.

In contrast, the public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated in an appropriate manner. *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir.1994)* ("[i]t is always in the public interest to protect the violation of a party's constitutional rights"). Retaining jurisdiction over this case is essential to protecting that public interest. Thus, the public interest clearly favors entering the preliminary injunction sought by Petitioners.

### V. CONCLUSION

Petitioners have requested 30 days' notice of any transfer from GTMO, a concrete, narrow, and minimally burdensome remedy. Based on the Court's analysis of the four relevant factors set forth in the applicable caselaw, it is clear that Petitioners have satisfied their burden. They are faced with an imminent threat of serious harm, which far outweighs any conceivable burden that the Government might face. Furthermore, while it is not possible to demonstrate a "mathematical probability of success," the questions are "serious, substantial, difficult and doubtful." *Washington Metro. Area Transit Comm'n, 559 F.2d at 844.* Certainly, the Government cannot argue that its success on the merits is a foregone conclusion. Finally, the public interest in granting Petitioners the requested relief is strong. Therefore, for the foregoing reasons, Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance Notice of Any Intended Removal from Guantanamo is granted.

**\*7** An Order will issue with this Opinion.

D.D.C.,2005.
Al-Joudi v. Bush
Slip Copy, 2005 WL 774847 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:05cv00301 (Docket) (Feb. 09, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SALEH ABDULLA AL-OSHAN *et al.*,　　　:
　　　　　　　　　　　　　　　　:
　　　　　　　Petitioners/　　　　　:
　　　　　　　Plaintiffs,　　　　　　:
　　　　　　　　　　　　　　　　:
　　　v.　　　　　　　　　　　　:　　Civil Action No.:　　05-0520 (RMU)
　　　　　　　　　　　　　　　　:
GEORGE W. BUSH *et al.*,　　　　　　:　　Document Nos.:　　3, 11
　　　　　　　　　　　　　　　　:
　　　　　　　Respondents/　　　　　:
　　　　　　　Defendants　　　　　　:
　　　　　　　　　　　　　　　　:

MEMORANDUM ORDER

GRANTING MOTION FOR STAY;
ORDERING 30 DAYS' NOTICE OF ANY INTENT TO MOVE PETITIONERS;
DENYING WITHOUT PREJUDICE MOTION FOR PRELIMINARY INJUNCTION AS MOOT

This matter comes before the court on the respondents' motion to stay proceedings pending related appeals and for continued coordination. On January 19, 2005, Judge Leon issued opinions in *Khalid v. Bush* and *Boumediene v. Bush* granting the government's motion to dismiss petitions for writ of habeas corpus brought by detainees at the United States Naval Station at Guantanamo Bay, Cuba ("GTMO"). *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005). On January 31, 2005, Judge Green issued an opinion in *In re Guantanamo Cases*, granting in part and denying in part the government's motion to dismiss in eleven cases consolidated for the purpose of that motion. *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005). The petitioners in the above cases filed notices of appeal, and the D.C. Circuit has yet to issue an opinion. Accordingly, the state of the law in this circuit concerning the habeas rights of GTMO detainees is unclear.

1

In its motion to stay, the government points to the inefficiency of resolving the merits of the instant habeas petition prior to the D.C. Circuit issuing a ruling that will cover similar matters. Respondents' Mot. to Stay at 1-2. The government states that during the pendency of the stay the government will not "block counsel access to properly represented petitioners. To that end, respondents do not object to entry in these cases of the protective order previously entered in other Guantanamo detainee cases, along with appropriate supplementary orders, to permit such access." *Id.* at 2.

The court is well aware of the petitioners' concern that the government may remove the petitioners from GTMO in the near future, thereby divesting (either as a matter of law or *de facto*) the court of jurisdiction. Such an outcome would abuse the processes now put in place for the purpose of adjudicating matters on their merits. *See Rasul v. Bush*, 124 S.Ct. 2686 (2004). Accordingly, the court cannot allow such a scenario to unfold; the court will "guard against depriving the processes of justice of their suppleness of adaptation to varying conditions." *Landis v. North American Co.*, 299 U.S. 248, 256 (1936). Coextensive with the district court's inherent power to stay proceedings is the court's power to craft a stay that balances the hardships to the parties. *Id.* at 255 (noting concerns regarding the stay causing "even a fair possibility . . . [of] damage to some one else"); *see also Clinton v. Jones*, 520 U.S. 681, 707 (1997) (noting that "burdens [to the parties] are appropriate matters for the District Court to evaluate in its management of the case").