**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

-------------------------------------------------------------------- x

**HAYAL AZIZ AHMED AL-MITHALI,**                          :
    **Detainee, Guantánamo Bay Naval Station**
    **Guantánamo Bay, Cuba,**                          :

**ALI AZIZ AHMED AL-MITHALI,**                            :
    **as Next Friend of Hayal Aziz Ahmed**
    **Al-Mithali,**                                   :
                     **Civil Action No. 05-CV-02186**
              *Petitioners*,        :   **(ESH)**

**v.**                                                    :

**GEORGE W. BUSH,** *et al.*,                             :

              *Respondents.*        :

-------------------------------------------------------------------- x

**PETITIONERS' OPPOSITION TO**
**RESPONDENTS' MOTION FOR PROCEDURES**
**RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS**

This memorandum of law is respectfully submitted on behalf of Petitioner Hayal

Aziz Ahmed Al-Mithali in opposition to Respondents' Motion for Procedures Related to

Review of Certain Detainee Materials.

**INTRODUCTION**

Respondents' motion in effect seeks the Court's post-hoc endorsement of an

egregious violation of both the attorney-client privilege and the Protective Order entered

in this case, and also seeks advance authorization to allow the military to seize and

review the detainees' privileged materials when Respondents or others want approval of

22245961v2

unwarranted future intrusions on the privilege. [1] Respondents have failed to demonstrate any justification for their prior actions or their proposed plan. The Court should deny their motion.

Respondents' argument is based on a fundamental contention, twice rejected by the Supreme Court, that the extent and scale of the legal rights and protections afforded to every litigant before the Court are, in the case of Al-Mithali and other Guantánamo detainees, inherently subject to Respondent's discretion. Every litigant before this Court has the right to expect that his right to the protections of the attorney-client privilege will be respected, and certainly will not be disturbed without prior review by the Court. But, following the deaths of three detainees, Respondents unilaterally seized the privileged files of every single Guantánamo detainee classified as enemy combatants, including Al-Mithali and others not even held in the same camp where the deaths occurred. Respondents have not demonstrated any connection between these deaths and Al-Mithali that would justify this seizure. Instead, Respondents rely on their now-common refrain that the detainees are violent terrorists and thus *ipse dixit* whatever rights they might have must yield to Respondents' interests.

Respondents' argument that the detainees' attorney-client privilege should be shunted aside in favor of the military's investigation not only is unsupported, but would ring a bit more credibly had Respondents presented that argument to the Court before (or

---

[1]    The American Bar Association has called for an investigation of the military's violation of the attorney-client privilege. *See* Letter from Michael S. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy (July 11, 2006) (attached hereto as Exhibit 1).

22245961v2

at least contemporaneous with) Respondents' seizure of privileged materials, rather than a month after the seizures had been completed. Respondents' post-hoc argument that a review of the detainees' privileged communications is vital to investigate the nature of the detainees' deaths is undermined by Respondents' delay in requesting Court approval to read all of that material. Under these circumstances, it is hard to resist the conclusion that Respondents' purpose in seizing and reviewing the detainees' privileged communications is animated by some interest in eavesdropping on attorney-client communication, and chilling the attorney-client relationships. Respondents' requested relief bears out this conclusion: Respondents frankly acknowledge that, besides looking for any information having to do with the three detainee deaths, Respondents intend to review privileged communications and files in hopes of discovering violations by detainees' counsel of the Protective Order. The Court should deny Respondents' motion, and do so in terms that clearly disallow the persistent threat of Respondents' interference with Al-Mithali's attorney-client relationship.

Respondents' unilateral decision to abrogate the attorney-client privilege and violate the Protective Order already has jeopardized the attorney-client relationship. Despite his experiences in the custody of Respondents, Al-Mithali relied upon counsel's representations and advice concerning the rights of litigants before the Court, and the scope and protections of the attorney-client privilege under federal law and confirmed in the Court's Protective Order. If Respondents are permitted unchecked power to seize the detainees' most confidential privileged communications, without any prior notice, the confidence of any reasonable person in the attorney-client privilege, the Court's

3

Protective Order and the attorney-client relationship itself would be seriously undermined.

We of course cannot state to the Court that Al-Mithali's confidence has been shattered – because Respondents regularly restrict our ability to see and communicate with him. Indeed, Respondents not only seized privileged files, but they also suspended legal mail service, and we can only suppose what a reasonable person would conclude after confidential and legally protected communications are seized without notice or explanation. Thus, though Respondents submitted two evidentiary declarations in support of their motion, we are unable to consult with our client or to respond with Al-Mithali's understanding of the facts.

The Court should deny Respondents' motion to review the seized materials and order Respondents immediately to return Al-Mithali's papers and provide assurance that no further interference with attorney-client communication will occur. In the alternative, any review should minimize infringement on Al-Mithali's right to counsel and be conducted by the Court or a special master.

## PROCEDURAL AND FACTUAL BACKGROUND [2]

A Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba ("Protective Order") was entered in this

---

[2]   Petitioners' counsel has not been able to communicate with Petitioner since Respondents filed this motion, and thus for the limited purpose of this response is constrained to rely on the declarations submitted by Respondents. Petitioner reserves and seek leave to later challenge any facts alleged by Respondents that are discovered to be inaccurate.

22245961v2

case on December 20, 2005 to permit attorney access to Al-Mithali and safeguard legal communications.  The Order was initially developed by Judge Joyce Hens Green in *In re Guantanamo Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004), based on the conclusion in *Al Odah v. United States*, 346 F. Supp. 2d 1, 5-14 (D.D.C. 2004), that Guantánamo detainees have a right to representation by and access to counsel, and that "the Government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."

The Protective Order contains carefully tailored mechanisms to safeguard the attorney-client privilege in legal communications while ensuring security at Guantánamo, chiefly through the establishment of a Privilege Team comprised of government attorneys and other personnel who have not and will not take part in court or other proceedings involving the detainees.[3]  The Privilege Team reviews "letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged documents and publicly-filed legal documents relating to that representation" but only for physical contraband, and then seals them for delivery to Guantánamo.[4]  Guantánamo personnel are prohibited from opening incoming legal mail, which must be delivered to detainees within two business days of receipt at the base.[5]

---

[3] *See* Protective Order Ex. A, § II.D.

[4] *Id.* §§ II.E, IV.A.3.

[5] *Id.* § IV.A.4.

5

22245961v2

Respondents, without notice or relief, disregarded the carefully drawn provisions of the Protective Order. On June 10, 2006, the military reported that three detainees at Guantánamo Bay had been found dead in their cells. The Naval Criminal Investigative Service ("NCIS") initiated an investigation to determine "the manner and cause of death."[6] According to Respondents, between June 10 and June 14, without notice to counsel or approval from the Court, NCIS seized and reviewed documents contained in cells of the deceased detainees and their neighbors.[7] Beginning on June 14, and continuing for five days until June 18, NCIS seized over a half-ton of written communication between hundreds of other Guantánamo detainees and their lawyers.[8] Immediately after the seizures, Respondent began sorting and reviewing the materials of some detainees.[9] Not until nearly a month after the three deaths, and only after detainees began to report the seizures of privileged material to their lawyers, who challenged the actions in court,[10] did Respondents file their motion and disclose its unilateral actions.

---

[6] Harris Decl. ¶ 2; *see also* Kisthardt Decl. ¶ 2.

[7] Kisthardt Decl. ¶¶ 2-3.

[8] Kisthardt Decl. ¶¶ 4-5.

[9] The government states that "NCIS personnel began sorting materials from bags pertaining to eleven detainees," and "looked at" the contents of three envelopes marked as attorney-client privileged information on June 18. U.S. Mot. 7. The government did not specify whether petitioner's written materials were among those subject to these examinations.

[10] *See* Mot. To Modify Stay To Direct Resp'ts To Return Impounded Privileged Legal Material and for Other Relief, *Abdullah v. Bush*, No. 05-CV-00023(RWR) (D.D.C. filed Jul. 5, 2006). The government states that its instant motion is an opposition to the *Abdullah* motion. U.S. Mot. 1 n.1.

22245961v2

Respondents continue to interfere with Al-Mithali's access to incoming legal materials. On June 26, 2006, Al-Mithali reported to counsel during a visit to Guantánamo that all legal materials had been seized and stored in a box outside his cell. Recently received legal mail had also been placed in a box outside his cell. While the unopened mail was within Al-Mithali's sight, he was not permitted to open it, and guards refused his request to open the letters and hold them up for him to read.[11] These actions clearly violate Section IV.A.4 of the access procedures established in the Protective Order entered in Al-Mithali's case, which requires Guantánamo personnel to deliver legal mail within two days of receipt.

Respondents ask the Court for post-hoc approval of their violations of the Protective Order and unilateral seizure of privileged materials, and for free reign to review all privileged materials obtained through violation of the Protective Order. Their motion should be denied.

## ARGUMENT

**I.     RESPONDENTS HAVE FAILED TO ESTABLISH THE EXTRAORDINARY CIRCUMSTANCES NEEDED TO INTRUDE UPON ATTORNEY-CLIENT COMMUNICATIONS**

### A.     Al-Mithali And His Counsel Have An Attorney-Client Relationship

An attorney-client relationship exists between Al-Mithali and his counsel, and that relationship is entitled to the same respect and protection as that of any other litigant and his counsel before the Court -- indeed, even that of Respondents and their counsel. "The attorney-client privilege is the oldest of the privileges for confidential

---

[11] *See* Lang Decl. (attached hereto as Exhibit 2).

7

communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." [12] As another Court in this district has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[13]

During pre-trial detention, the protection of the privilege is particularly necessary to ensure effective assistance of counsel: "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[14] For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[15] Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of

---

[12] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *see also Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (quoting *Upjohn*); *Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.")..

[13] *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004), *appeal argued*, No. 05-5096 (D.C. Cir. Mar. 22, 2006).

[14] *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[15] *Bach*, 504 F.2d at 1102.

22245961v2

professional representation or other aspects of the right to access to the courts are invalid."[16]  These principles are reinforced by the Court's entry of the Protective Order, which allows for confidential communications despite the conditions of Al-Mithali's confinement.

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with access to the courts.  "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[17]

### 1.    Respondents Did Not Make The Required Individualized Showing That Review Of Al-Mithali's Privileged Material Is Necessary

Abrogation of the attorney-client privilege in any context requires a specific, individualized showing that there is sufficiently compelling justification to invade the privilege.  For example, when the government invokes the crime-fraud exception to the

---

[16] *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401, 407-414 (1989).

[17] *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers, if proven, may have denied plaintiff access to the courts).

attorney-client privilege, it bears the burden of showing that the particular client in question "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[18]  Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and screen for privileged materials.[19]  Even *in camera* review of privilege material by the court requires "a showing of a factual basis [that]…the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[20]

Respondents' motion contains no allegations that Al-Mithali had any relationship with the three detainees who died or that Al-Mithali's privileged material had been linked to those detainees.  Respondents do not allege that the notes described in its motion were in Al-Mithali's possession, in his handwriting, or refer to him.  Respondents do not even allege that Al-Mithali was held in the cellblock or camp where the deaths occurred.

---

[18] *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) ( vacating and remanding contempt order where insufficient evidence supported intent to further fraud); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[19] *See, e.g., United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

[20] *United States* v. *Zolin*, 491 U.S. 554, 572 (1989) (quotations and citation omitted).

22245961v2

Respondents have presented no specific evidence that Al-Mithali misused his attorney-client materials in furtherance of such a "plot" or for any other purpose. There is certainly no basis for invading the fundamental attorney-client privilege.

Respondents' generalized security concerns do not justify wholesale invasion of the privilege. To allow that would mean, in practical terms, that the privilege would cease to exist for detainees at Guantanamo. Courts already have rejected Respondents' prior applications to set aside the attorney-client privilege based on similar broad-brush contentions. For example, when Respondents sought to justify the real-time monitoring and recording of attorney-client meetings, claimed that the detainees would use meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security."[21] The court rejected Respondents' claims, finding them "thinly supported."[22]

**2.    The Handwritten Notes Do Not Justify Wholesale Intrusion Into Privileged Materials**

Respondents bear the burden of making a particularized factual showing that the protections of the attorney-client privilege should yield. Respondents have failed.

Respondents contend that their intrusion into the attorney client communications is justified by the discovery of a few handwritten notes of relevance to the NCIS investigation. The only connection between the notes and privileged material is that

---

[21] *Al Odah v. United States*, 346 F. Supp. 2d 1, 4 n.4 (D.D.C. 2004), *appeal argued*, No. 05-5096 (D.C. Cir. Mar. 22, 2006).

[22] *Id.* at 10.

11

Respondents claim -- without producing the notes for review -- that the notes were written on paper stamped as attorney-client communication.  On that slim basis, Respondents seek to set aside the attorney-client privilege of every detainee.

Respondents have failed to present any basis, let alone a compelling particularized showing, to vitiate Al-Mithali's rights.  The few notes Respondents describe are not even evidence of an abuse of the privilege, but rather the expected consequence of detainees being denied paper.  The fact that one note was found "hidden" in the cell of a deceased detainee suggests the detainee was not relying on an assertion of privilege to protect his writing.[23]  The notes, as described by Respondents, do not provide a sufficient basis to deprive all detainees of the attorney-client privilege.[24]  Each detainee is entitled to individualized review, rather than an invasion of the attorney-client relationship based only on guilt by association.

B.    **Intrusion On The Attorney-Client Privilege Would Severely Undermine The Attorney-Client Relationship Between Al-Mithali And Counsel**

An effective attorney-client relationship depends on trust, a particular challenge for detainees at Guantánamo who have been detained for years by a foreign government, in an unfamiliar legal system, subject to extreme conditions of detention and with almost no communication with the outside world.  Al-Mithali understood that attorney-client

---

[23] *See* Kisthardt Decl. ¶ 3.

[24] Respondents should be required to (a) produce the notes so that the Court can assess their relevance and (b) produce the declarants, Rear Admiral Harry B. Harris, Jr. and Special Agent Carol Kisthardt, for cross-examination to determine how extensively Respondents have already intruded on the attorney-client privilege.

communications and his files were legally protected and subject to a Protective Order issued by the Court. Then he saw Respondents cart off every file and terminate legal mail service. Al-Mithali did not even have the opportunity to disbelieve the Respondents' representation that they only "scanned" a few detainees' files, because Respondents delayed a month before making that representation, and Al-Mithali still has not seen it nor been permitted to speak to counsel. Unless the Court denies the motion and refuses to allow persistent interference with the attorney-client relationship, Respondents' actions, if they have not already, will have a chilling effect on Al-Mithali's attorney-client relationship.

### C.   Respondents' Proposed Plan Would Continue To Interfere With The Attorney-Client Relationship And Communications Indefinitely

Indeed, Respondents' application proposes continuing and indefinite interference with the attorney-client relationship. Respondents give no indication of how long the proposed review will take or whether all detainees' material will be withheld until the review of all material is complete. Nor do they explain what has happened to legal mail that arrived after the deaths or indicate how detainees will have access to their legal materials in the future. Respondents fail to explain how they intend in the future to monitor legal materials and mail – for example, whether they intend to regularly seize and review privileged communications. The ineluctable extension of this motion is the complete termination of the detainees' attorney-client privilege and effective gutting of

22245961v2

the Protective Order.[25]  The combination would have an unacceptable chilling effect on the relationship between counsel and detainees and prevent detainees from receiving effective assistance of counsel.

Because Respondents have provided no evidence that a review of Al-Mithali's privileged material is necessary, their motion should be denied in its entirety and Al-Mithali's legal materials should be immediately returned to him.

## II.    IN THE ALTERNATIVE, ANY REVIEW SHOULD MINIMIZE INFRINGEMENT ON AL-MITHALI'S RIGHT TO COUNSEL AND BE CONDUCTED BY THIS COURT OR A SPECIAL MASTER

### A.    Any Review Should Be Carried Out *In Camera* by The Court or a Special Master

If further review of the detainees' legal papers is allowed, use of a Department of Defense Filter Team is inappropriate.  As Respondents acknowledge, *see* Resp. Mot. at 21 n.12, courts are reluctant to entrust attorney-client privileged materials to such governmental teams.  Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."[26]  Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents

---

[25]    Respondents assert that "procedures at Guantanamo that accommodated detainees in ways that may have given them opportunities to abuse the legal mail system—for example, permitting counsel to provide detainees with notepaper stamped with attorney-client confidentiality markings—will be revised going forward to make it more difficult to abuse the system," without explaining how the attorney-client privilege and access to counsel will be protected.  Resp. Mot. 19

[26]    *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006); *see, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege).

14

by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.[27]  Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[28]

Especially given Respondents' history of interfering with the attorney-client relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of monitored attorney-client communications,[29] "it is important that the procedure adopted on this case not only be fair but also appear to be fair."[30]  Yet "[i]t is a great leap of faith to expect that members of the general public would believe any such Chinese wall would be impenetrable; this notwithstanding…the honor of [those involved]."[31]  Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[32]

The appearance of fairness is especially crucial here, given the obstacles to establishing the trust required for an effective attorney client relationship – and that

---

[27] *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006),  *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

[28] *United States v. Stewart*, No. 02 Cr. 395, 2002 WL 1300059, at *19 (S.D.N.Y. June 11, 2002).

[29] *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 n.11 (D.D.C. 2004),  *appeal argued*, No. 05-5096 (D.C. Cir. Mar. 22, 2006).

[30] *Stewart*, 2002 WL 1300059, at *23.

[31] *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[32] *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

22245961v2

Respondents erected many of those obstacles.  Before *Rasul*, the detainees had "been detained virtually incommunicado for nearly three years without being charged with any crime."[33]  Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system."[34]  The detainees also had been subject to extreme interrogation techniques that included fomenting distrust of civilian counsel by, for example, reporting that civilian counsel are Jewish and therefore can't be trusted.

> **B.**    **The Proposed Review Is Overbroad For Its Stated Purpose**

Regardless of who conducts the review, if it is allowed to proceed, the parameters proposed by Respondents are too broad.  The stated purpose of the review is "to fully uncover the complete circumstances of the suicides, including the extent to which coordination among and assistance from other detainees and others existed, as well as any other plans for additional detainee suicides or other violence"[35] and "to ensure the safe and humane care and treatment of the enemy combatants detained at Guantanamo, as well as the safety of all personnel who enter and work in the detention facilities."[36]

Any review the Court permits should be limited to materials relevant to this purpose.  Detainees have no access to typewriters or computers, and thus any typed documents without handwriting are irrelevant and should immediately be returned.  That

---

[33] *Al Odah*, 346 F. Supp. 2d at 8.

[34] *Id.*

[35] Resp. Mot. 16.

[36] Harris Decl. ¶ 4.

16

obvious restriction should significantly reduce the half-ton of documents seized by Respondents.[37]

### C.   The Filter Team Should Be Prohibited From Disclosing Violations Of The Protective Order

Respondents cite the detainee deaths, but in fact intend to pursue two independent reviews of privileged material. First, the Filter Team intends to review privileged material for information related to the recent deaths of the three detainees. Second, the Filter Team would review privileged files for evidence that counsel provided material to detainees in violation of the Protective Order and "bring[] the matter to the Court's attention for appropriate action."[38]

Respondents' plan – to exploit the deaths of three detainees and seize privileged files, in violation of the Protective Order, so they can search for evidence that some detainees' counsel might have violated the Protective Order – should swiftly be rejected. As one court noted, "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[39]  Respondents should not be given a blank check to violate the

---

[37] Respondents' suggestion, unsupported by any evidence, that review of all material is warranted because counsel may have participated in the suicide plots—it seeks to determine "the extent to which coordination among and assistance from other detainees *or others* existed"—is irresponsible, at best, and the Court should dismiss it.

[38] Resp. Mot. at 11, n.10.

[39] *Al Odah v. United States*, 346 F. Supp. 2d 1, 14 (D.D.C. 2004), *appeal argued*, No. 05-5096 (D.C. Cir. Mar. 22, 2006).

17

Protective Order and privilege to conduct fishing expeditions for possible violations of the Protective Order.

### 1.   Respondents Produced No Support For Their Allegations That Counsel Have Violated The Protective Order

Respondents have provided no factual basis for authorizing a wholesale invasion of the attorney-client privilege to hunt for detainees' counsel perceived violations of the protective order.

### a.   Documents Cited In The Motion Do Not Support Respondents' Allegations

The two typewritten documents that Respondents claim to have found in an attorney-client envelope are not indicative of violations of the protective order.[40]  The document labeled "FOUO" is a red herring.  "FOUO" or "For Official Use Only" stamps are not classification designations.  "FOUO" is an internal Department of Defense designation to indicate whether a particular document must be released to the public under the Freedom of Information Act.  It is applied to "[i]nformation that has not been given a security classification pursuant to the criteria of an Executive Order, but which may be withheld from the public."[41]  The designation is specifically "not authorized as an anemic form of classification to protect national security interests."[42]  The Protective Order does not prevent detainees from being in possession of FOUO documents.  That a

---

[40] Respondents should be ordered to produce those documents so that the Court may more accurately assess whether they violate the protective order.

[41] 32 CFR § 286.15(a).

[42] *Id.*

18

detainee possessed such a document therefore is not evidence of abuse of the attorney-client privilege.

The document that is marked with a crossed-out "SECRET" stamp is apparently not a classified document and therefore also should be of no concern.  Respondents have not disclosed the document, but importantly, they do not allege that the document currently is classified or designated as SECRET.  Documents that were once classified and that—whether by request of counsel or the media, or *sua sponte* by the government—have been declassified often are produced to the public with the original "SECRET" stamp crossed out and "Unclassified" written beside it.  The Protective Order does not prevent detainees at Guantánamo from possessing unclassified documents .

Respondents describe a single document that, from Respondents' description alone, may not have been allowed to be in the possession of a detainee.  But that document is an internal JTF-Guantánamo e-mail which obviously could not have been provided to a detainee by counsel, since counsel does not have access to such documents.  Counsel respectfully suggests that the NCIS inquire of JTF-Guantánamo and its staff to determine the provenance of this document, rather than exploit Respondents' own apparent security breach as an excuse to rifle through the privileged papers of Al-Mithali and every other detainee in the prison.

### 2. Respondents Have An Adequate Remedy For Violations Of The Protective Order

The Protective Order sets out a procedure for addressing any violations  by habeas counsel.  It provides that "any violation of the terms of this Protective Order shall be

immediately brought to the attention of the Court and may result in a charge of contempt

of Court and possible referral for criminal prosecution….[and] may also result in the

termination of access to classified information and protected information."  If

Respondents suspect violation of the Protective Order , the proper remedy is to bring that

violation to the attention of the court in which the case in question is filed—not to use the

more generalized suspicion of possible violations as a basis to seize the privileged

materials of all of the hundreds of habeas counsel.  Indeed, where Respondents have

alleged violations of the Protective Order in the past, individualized remedies have been

sought with regard to the counsel involved.[43]

     If a review of privileged material is authorized, it should be limited to handwritten

material and only material relevant to the NCIS investigation of the detainees' deaths or

plans for similar acts should be disclosed.

     **D.**    **Any Review Should Be In Accordance With Procedures Designed To Minimize Infringement On Al-Mithali's Right To Counsel**

     Regardless of whether the Filter Team, the Court or a special master conducts the

review, it should be done pursuant to procedures to mitigate, as much as possible,

damage to the attorney-client relationship.  In addition to the limitations described above

(namely that the review should be limited to handwritten material and only material

relevant to the NCIS investigation should be disclosed), the time for any such review

should be limited because the seizure and retention of Al-Mithali's legal materials, and

---

[43] *See* Stipulation and Order filed May 3, 2006 in *Al Joudi v. Bush*, No. 05-CV-301 (GK); *Al Oshan v. Bush*, No. 05-520 (RMU); *Al Subaiy v. Bush*, No. 05-CV-1453 (RMU); *Al Shareef v. Bush*, No. 05-2458 (RWR).

22245961v2

the reported failure to deliver new legal mail, constitute an ongoing impairment of Al-Mithali's right to effective counsel and to meaningfully participate in this litigation. In addition, procedures for the prompt return of all cleared materials to Al-Mithali must be established. Review procedures should also provide for counsel to receive notice of, and an opportunity to respond to, any documents identified as relevant to the NCIS investigation prior to disclosure.

## CONCLUSION

For the preceding reasons, Al-Mithali respectfully requests that Respondents' motion be denied or, in the alternative, that any review permitted be conducted by the Court or a special master under procedures designed to minimize infringement on Al-Mithali's right to counsel.

Dated:  July 21, 2006.

Respectfully submitted,

Counsel for Petitioners:

  /s/ Jeffrey I. Lang
Jeffrey I. Lang (admitted *pro hac vice*)
Jennifer R. Cowan (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel:  (212) 909-6000
Fax:  (212) 909-6386

John B. Missing (Bar No. 425469)
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.
Washington, D.C. 20004-1169

21

22245961v2

Tel:  (202) 383 8000
Fax:  (202) 383 8118

22245961v2